121518 Grayson Consulting, Inc. v. Wachovia Securities, Inc. Good morning and may it please the Court, my name is Tucker Harrison Byrd and it is my privilege to represent the appellant, Grayson Consulting. Members of the Court, we proceed today in the stead of the trustee in the bankruptcy estate in this case. And the fundamental principle at issue is whether or not the clawback fraudulent transfer remedies of the bankruptcy code can be used in this case against brokerage firms like Ponzi. This conduct facilitates a massive Ponzi scheme. The avenue of enforcement was severely curtailed by the lower court's ruling that erroneously one, limited what would be deemed a transfer of the debtor's property and secondly, misclassified other transfers as falling within what is known as the stock brokerage exception under 546E. The bankruptcy code, as I'm sure the Court is aware, affords the estate and thus creditors of the estate a powerful tool, a clawback provision found under sections 544, 546 and 548. The primary element to be proven aside from the underlying fraud itself or the intent to frustrate creditors is this question, was there a transfer of the debtor's property which occurred? Here we submit, and we believe that the bankruptcy court had it wrong, we believe the district court's affirmance had it wrong, we submit there was at least four distinct transfers that occurred that should have been clawed back. And I'll go through them one at a time and then talk about each in detail. First, when the victim's stock shares, about $161 million worth, were delivered into the account, simultaneously the debtor afforded Wachovia dominion and control over those shares by virtue of the margin agreement. That's transfer number one. Secondly, when some of those same shares were transferred out of the account to Wachovia to settle the sales transactions by which those shares were effectively washed. The third transfer, when the debtor transferred $828,500 of cash into the account, and again by virtue of the margin agreement, there was a transfer of rights to Wachovia. And then finally, when that cash was taken out of the account to settle purchases of stock made by the debtor to cover up the Ponzi scheme. With respect to the first transfer, this is the transfer of shares into the account. This is obviously drawn a lot of attention by Wachovia in what they call the metaphysical argument. And this is the full-on assault they make on the GRED decision. The GRED decision stands for a fundamental proposition, gentlemen, and that is this. That when a brokerage firm, by virtue of its margin agreement, establishes enough control or right to control the shares in the account such that it is deemed to be affecting dominion and control over the account, that's considered a transfer. And even if you layer in the teachings of the Bowers...  It was not debtor property prior to the transfer into Wachovia. In other words, when the shares were in the hands of the victims, it was the victim's property. But everybody acknowledges, even the appellees, when the shares hit the account, two things happened. One, those shares became the property of the debtor. Simultaneously, we do know that Wachovia obtained rights in those shares by virtue of the margin agreement. What would you say is the debtor? The debtor in this case would be Derivium. And once it got into Wachovia, it belonged to Derivium right then. Correct. That is your position. Correct. And simultaneously, Wachovia obtained rights in those shares. As we know from the Lowry case, which is also from the Fourth Circuit, one doesn't have to have the unfettered control to have been transferred property. And in this case, that's exactly what happens. The shares are in Derivium's account. Wachovia has ample dominion over it. In fact, executes that dominion in this respect. Essentially what it does, whenever it needed to access the account to transact the business, it accessed the account. For example, it could take settlement payments out. It could take margin payments out. So let me make sure I understand. It was not debtor property before it transferred. Right. It was not debtor property before it hit the Wachovia account. Correct. So before it was transferred, it was not debtor property. Correct. So how is debtor property being transferred? When it hit the account, the moment it hit the account, Wachovia obtains also simultaneously rights in the collateral by virtue of the margin agreement. Wachovia is not the debtor. Wachovia is not the debtor. Isn't it as simple as it was transferred into the account at the direction of the debtor? And this is just a bunch of semantics. Ultimately, the debtor had control of this stock as a result of the agreement to lend money to these individuals in exchange for the stock. Well, certainly the debtor had control of the account and the stock. But Wachovia also had control over the account and the stock by virtue of the margin rights. But it didn't have control of the stock to require the transfer into the account. That's correct. But once it hit the account, it's obviously debtor's property when it hits the account. They would not contest that. But not during the transfer. Not during the transfer. Once it hits the account, though, simultaneously, the debtor is affording rights and powers and privileges to Wachovia. But we're clear there's no transferring debtor property. It only becomes debtor property, in your view, when it actually is in the account. That's correct. And it's by virtue of being in the account. That's where transfer number one occurs. But take it a step further. By virtue of being what transfer? It's in the account. There's no transfer. Transfer has already happened. But simultaneously with the receipt into the account, rights are being transferred to Wachovia by virtue of the margin. It obtains rights when it hits that account. Wachovia does. So we're talking rights as opposed to the stock itself? Well, certainly it's rights to the stock. It's rights by virtue of the margin agreement. Wachovia has the power. Who transfers those rights, not the debtor? Well, certainly the debtor does by virtue of the margin agreement. That's the teaching of Gress. It has to be in the account. Then they can do something. But from the borrowers, or as you say, the victims, to the bank, there's no debtor. That's correct. But once it hits the account, it's now the debtor's property in the account, and simultaneously Wachovia transfers property rights to Wachovia by virtue of the agreement. For example, Wachovia can go in and take money out of the account to settle a margin. Wachovia can go into the account and take Who's the initial transferee? Well, everything starts with the victim, of course. They are the initial transferees. That's correct. They are not debtors. The initial transferee depends on what transaction you're looking at. As from the debtor to somebody, the initial transferee is Wachovia. The transferee derivative has the stock in its account. The first thing it does, it gives property rights to Wachovia by virtue of the margin account. And your position is those rights, whether exercised or not, are sufficient to constitute a fraudulent transfer? That alone, we believe, would be the teaching of Gregg. Let me back up just because I thought you had made an argument in your brief, and perhaps I misunderstood it about this transfer issue that Judge Wynn is talking about because as I understood it, and maybe you're not making this argument, maybe I am, that this whole thing started with an agreement between these individual plaintiffs to transfer their stock to Derivium in exchange for loans. That's correct. And then the rights to have the property returned back to them, the stock, and or not. But isn't it the reality that this stock was transferred at the direction of the debtor, in this case Derivium, into Wachovia's account? And isn't that the transfer that we need to be focusing on? Well, by debtor, you mean the victims or Derivium? I'm talking about Derivium. When the shares hit the account. At whose direction? Well, whether it's coming from the victims or another related Derivium account, once it hits the account. But it hits the account at whose direction? It hits the account at the debtor's direction, right, as part of this earlier agreement to transfer the stock. Well, that's correct. So why isn't that the transfer? Well, but at that point in time, until Derivium actually receives the shares in the account, it doesn't own the shares. It has no property rights, you see. So you've made it clear that the debtor didn't transfer this property initially into the account. That is correct, isn't it? That came from the victims or the borrowers. They did the transfer into the account. What you then say is Wachovia, on the second transfer, become, I don't know how, an initial transfer. No, but remember, the question is, when we're looking at the bankruptcy context, is was property of the debtor transferred out? Not whether the property of the Ponzi victim. That's not the analysis. The analysis begins on a clawback. Did the debtor have property? Yes, it had property shares in an account. And what happened to those shares? Well, it gave. How was it transferred out if, under Judge Diaz's indication, they're already kind of controlling this? It's just rolling through this account onto them. I mean, that's what you just agreed to. You just said, didn't you just say that the debtor did this at his own direction, moving this property on through the account, and he's got it. So where is the transfer once it gets to Wachovia? What I said, Judge, was that until the shares hit the account, the debtor doesn't own the property. It's still the victim's property. I understand that part, but the part I'm trying to understand is your response to Judge Diaz that you say, oh, they control this from the perspective of moving it to the account. That was sort of the proposition I think he presented. And you said, yes, that's right. If that's true, then what were they transferring, whatever they told you to transfer in? No, what I mean to say, to be clear about this, is that obviously this is a flow of a transaction. It starts with a victim. Oh, it's a flow of which transaction? The initial transaction from the borrowers to the account, and it's just flowing? Of the overall. Are there two different transfers, as I understand? It seems that you are arguing there are two transfers, one from the borrowers to the bank, then it takes on a character of being the debtor's property, and then the bank then sends it off. That's what you argue. In fact, that's true. The flow I'm referring to is the Ponzi flow. But if one looks at did the debtor transfer a property, the answer is yes. The debtor, the derivative, had shares in the account, and when did it transfer? It transferred four times after this. What's in that account transfers out. First, with the granting of the rights and the margin. Secondly, is what does it do with those shares? What it does with those shares is the shares are taken out of the account to settle a sale transaction. That's the second transfer. That's done at the direction of the debtor. That's correct. But it's also done basically under the power of Wachovia as the brokerage firm clearing the trades. So at the direction of the debtor, it then transfers these shares. They've been transferred in by these borrowers. And by virtue of that, you now say that those shares are now part of the debtor's estate, which you essentially represent. And the debtor should benefit from his estate through his substitute trustee. That's correct. There's a lot of that. That's exactly. What court has allowed that? I don't. Aren't the cases specifically to say that we don't think that's a good idea, that there's a doctrine that says that that's not a good thing when you allow this property to get in here and then you move it, and at the end result we now give it back into the estate for the benefit of the wrongdoer here who's. But that's actually mixing arguments that the appellees are making. Right now we're talking about the fraudulent transfer claims. There's a whole other group of claims, the tort claims, which obviously fall under the imperative delictive argument. We're talking about just the fraudulent transfer, and that is this, Your Honor. Should the court pull assets back into the trustee estate for the benefit of the creditors, not for the benefit of the wrongdoers. We're talking about the creditors, which in this case would be, you know, those people whose obligations were left unsatisfied by the estate. Victims of the Ponzi scheme. Could be the victims of the Ponzi scheme. Could be any creditors of the estate. So when one talks about the wrongdoer, that's really sort of implicating the imperative delicto as to whether or not the direct claims of the debtor, for example, against Wachovia for breach of fiduciary duty, conspiracy, and those kind of claims, whether those claims do survive. That's a whole other analysis, which I'll address at the end. But one follows just a simple argument, which is, on a fraudulent transfer, the question is, was there a transfer? Yes, when the margin rights were afforded to Wachovia under the agreement. Secondly, when Wachovia took those shares to settle the sales transactions, and remember, when Wachovia is selling the shares, it is not a mere conduit. That's an argument that's thrown around in these cases. You're saying it's a knowing participant? Well, whether it is or it isn't, the court never got to that point. What it did is it eliminated the claim on the threshold issue, was there a transfer? What the court said was, no, it's just a mere conduit, that when a stock brokerage firm is clearing a sale transaction, it's merely just sort of a thoroughfare between the buyer and the seller. And that fact is not true. It's not the mechanics of how transactions are done. When Wachovia sells to the market, or Wachovia buys from the market, which was another part of this transaction, Wachovia has direct liability to the market to deliver on the cash or the stock. In that case, Wachovia has real skin in the game. It's a far cry from a lawyer who receives money into a trust account and is just simply going to be making payments out of it, or a bank, which is basically honoring checks drawn on the account. In those cases, the lawyer or the bank may have no direct liability to the outside world. In this case, Wachovia had liability, and the way it satisfied the liability was another indicia of a transfer, and that would be taking shares out of the account to settle on a sale transaction, or taking cash out of the account to settle on a purchase transaction. Are you trying to recover the customer transfers as settlement payments? No, Your Honor. That's not how we would look at it. What we're trying to recover is any asset that left the debtor's account that was transferred to Wachovia should be dragged back into the estate for purposes of debtor. It was clearly a transfer. How much are you claiming that you ought to get back here? Well, that's a great question. Well, that's a great question. That's a bottom-line question. How much money are you claiming? It depends on— What's the number? Have you got a number? It depends on what theory of liability you're proceeding under, and I'll give you an example. Under 548A1, the clawback is one year. Under 544B, which implicates state law, which in this case is the— I'm from Florida. It's a great state of South Carolina—the Statute of Elizabeth, which is three years. If one looks back three years, it could be over $160 million. Well, what if it's one year? Well, if it's one year, for example, with respect to the commissions, it's one thing. If it's three years, it was $626,000, I believe it was. If it's one year, it's $626,000. If it's three years, it's several million? That just depends on what element you're talking about. Well, I understand, but what's your position? I'm just trying to figure out what your claim is here. With respect to the stock transfers, it's about $161 million of shares that were washed through this account in the three years preceding the filing of the bankruptcy. And you want Wachovia to pay $161 million? I believe the court could fine that, yes, sir. Into the debtor of state? Yes, sir, absolutely. And if one looks at other elements, other transfers out, for example, and this is dealt with in great detail, the payment of commissions and margin interest, clearly those, again, are another indication— Are those over and above what you just gave me, the $161 million? Those would be—yes, they are. Well, how much is—what's the number? There's got to be one number. It's at least $161— How much is it? Well, it depends. Again, that gets into the facts of the case. I mean, we know that about $161 million of transactions went through this account during this time period. If you go back to the entire length of the scheme, of course it was close to a billion dollars. But you admit that part of it you can't get because of the statute of Elizabeth and all this stuff. No, what I'm saying, Your Honor, is it depends on which statute applies. And I'll give you, for example, 546E. I thought I was asking a simple question. I didn't mean to take up your time, your red light's on, or the court's time. But I just thought I was asking a simple question, how much your claim is, and you don't know. Well, no, actually I do know. You do know. You haven't given me a number. Yes, the claim is— You haven't given me a number. Under the— You haven't given me a number. $161 million, Your Honor, under 544B. It could be as much as that, even if the court came back and said under 548A1A, which is a one-year period. Again, you would take these transactions during that period, and you might also look at the margin interest that was paid out and the commissions paid out during that period. Or, if you're looking under 541B for just the margin commissions, that alone is 672. All of these numbers, it depends on which theory of liability the court is actually going to apply. But the fundamental question really boils down to, was there a transfer or not? Let's see what the other side has to say. All right. Thank you. Mr. Ratner. Yes, Your Honor. Good to have you here, sir. Pleasure to be here, Your Honor. May it please the Court, My name is Stephen Ratner, Proskauer Rose, appearing for the appellees. Mr. Byrd moved around through some different concepts, and in our brief, actually I think we make that very point, and we say that we've separated those out. And I'm going to try and put some order to some of the things that Mr. Byrd was talking about here. There are two distinct categories of claims that are before this Court. There are common law claims. Nine of those claims were asserted. And there are two fraudulent transfer claims. The first category is barred completely by the doctrine of impari delicto. For those claims, Grayson Consulting stands in the shoes of the trustee, and the trustee stands in the shoes of the debtor. Those are the tort claims. Those are the tort claims, Your Honor, exactly so. So with respect to all of those claims, the doctrine, the well-established doctrine of impari delicto, bars those claims entirely. And I'll talk about that briefly in just a moment. With respect to the second category of claims, the fraudulent transfer claims, where Mr. Byrd began, the starting point is that if there is property belonging to the debtor that was improperly transferred or was transferred out, bring it back. But it has to be, Judge Wynn, as you said, has to be property that belonged to the debtor or property in which the debtor had an interest. It wasn't with respect to these customer transfers and all these magical simultaneous things that Mr. Byrd talks about. First of all, they didn't happen. Second of all, they don't matter. So the first... Tell me what, maybe I misunderstood. I understood there is a transfer that happens initially from the customer or the borrower or victim, as he called, to the bank. But it seems as though Byrd then said, well, once it's in the bank, it's debtor property. We agree. And then it transferred. And that's the initial transfer is by Wachovia, and that's what we're talking about. And then Judge Diaz added something to it that I'm trying to put in the mix, and that is, well, the initial transfer from the borrowers was at the direction of the debtor. And maybe that had colored the way in which we view it. Well, Your Honor, if I may, I'd like to just take a step back on this. Derivium did business with a lot of customers, a lot of borrowers. They had whatever transactions they had with them, to which Wachovia was not a party, not a party to any of the agreements. This is all laid out in the briefs and in the decisions below. Borrowers transferred, pursuant to their agreement with Derivium, transferred their shares to Derivium's account at Wachovia. Wachovia is a brokerage firm. It provides brokerage services. The shares went into that account at Derivium's direction, and those shares went out of that account at Derivium's direction as part of Derivium's transactions, selling the stock or doing whatever it did with the stock. Wachovia was a financial intermediary, nothing more. That's all it was. And the cases which we discuss in our brief from the Kaiser... That goes to the issue of control. Yes, sir. But back to this issue of the transfer. When these individuals entered into these agreements with Derivium to transfer their stock in exchange for these loans, at that moment in time, did Derivium have a sufficient property interest that it could then transfer to Wachovia? No, sir. Why not? No, sir. The stock belonged to the customers, to the borrowers, until the moment it hit the account, until the moment it hit Derivium's account. There's no dispute about that. That's admitted by Mr. Grayson's company in their brief and in the case below. So Derivium had nothing, no interest in that stock until the stock hit its account. And these accounts were the accounts of the debtor. We lay out in our brief the reasons for that under the securities laws, under the customer agreements. These, the account, the assets in the account, belonged to the debtor. Only the debtor had property rights. Let me ask you this. What if these individuals had simply transferred this stock directly to Derivium as part of the initial agreement? Then Derivium then transferred the stock to Wachovia. Different result? May I ask you a question, Your Honor? Yeah. When you say transfer the stock, do you mean actually transfer the stock or put it in its account at Wachovia? There's a big difference. Put it in a separate account. Derivium had an account, maybe in a safe deposit box, and then ultimately Derivium transferred the shares to its brokerage account. Do we have a transfer at that point? No, sir. Because if you have $10 in your pocket and you put $10 in your bank account, are you transferring that $10 to the bank, or do you still own the bank account? That's what happened here. Wachovia is a financial intermediary. That doesn't seem to be going to be questioned. See, if you've got $10 in your pocket and you give it to someone else and that someone else takes it to the bank, I think the question is, is that a transfer? If he gives the stock to Derivium before the transfer, clearly it must be a debtor transfer then because Derivium owns the stock. Well, Derivium is the debtor, Your Honor. But it didn't happen in this instance. That's a hypothetical he's giving. Exactly, and I want to make sure I'm getting your questions correct. We have the customers, the borrowers, they transfer stock to Derivium. The mechanic by which they transfer that stock is they transferred it into the debtor, Derivium's account, its brokerage account at Wachovia. At that point, I'm sorry, at that point that became Derivium's property. Derivium had full ownership of that, and they put it, rather than in its pocket, they put it in its brokerage account at Wachovia, Derivium's property. Your Honor, Judge Diaz, you asked the question, what would happen if they had gotten the stock outside? You know, physical shares, okay? And they have the physical shares and they walk into a Wachovia branch and they say, please put this in my account, my debtor's account at Wachovia. It's still, they haven't transferred it to anybody. They put it in their securities account. And the cases we cite in our brief are very clear on that. You have a financial... What Mr. Byrd is trying to do in his argument, what Grayson Consulting is trying to do here, is erroneously deconstruct the securities settlement process. If you have shares of stock in your account, you own 100 shares of the ABC company, whatever it is, and you want to sell those shares, you call your broker and you enter a sale order, and the processing is, they go out of your account, on through different brokerage firms, there's clearing, there's all of these processing things that happen, and they wind up in Judge Wynn's account at a different brokerage firm. But the financial intermediaries involved here are simply financial intermediaries, and that's what we have here. And what Mr. Byrd is arguing to you is, no, there is, in effect, a sale, a transfer, from Derivium to Wachovia, and then another sale. That's not the way... That's not the way the system works, and I would call the court's attention to the Kaiser Steel case, which is one of the leading authorities on this, which deals with that, which held in that case that Schwab could not be held liable in that situation because it's just a financial intermediary. Mr. Byrd argued that there's some kind of guarantee that's involved in the security settlement process. There is. There is. But that... but when brokerage firms or clearing firms or financial intermediaries guarantee parts of the transactions, that's the way the financial... the security settlement system works. It's not being discussed in terms of initial transferee, which is really what we're talking about. And if you look at the Plassian case, which Grayson Consulting talks about in its reply brief, there's one particular footnote there. You'll see that those are words taken out of context. That case was a leveraged buyout case. It had nothing to do with initial transferee. And so what Mr. Byrd is arguing to you is he's trying to create different transfers when, at all times, the shares came in from borrowers into the account that belonged to the debtor until the debtor sent them out to the street, to some buyer or to some other company. Wachovia was simply the repository and the financial intermediary, as is the case in so many other cases. Did they claim that Wachovia was in on this Ponzi scheme? Oh, they've made that claim. It's never been established in this case or anything of the sort, and it's irrelevant, Your Honor. It's irrelevant to the claims... If Wachovia was really a co-schemer, it'd be a participant in the whole thing. Well, that might be... Would that make a difference? No, Your Honor. That might... It wouldn't make a difference. No, sir. Even if they were a co-schemer, you wouldn't be liable here. Well, exactly. May I explain? Well, sure. Again, I want to come back to the two categories of claims. First of all, it's never been established they were, and of course we deny that. But with respect to the first category of claims, the tort claims that are barred by impari delicto, every time you have the impari delicto defense, the defendant is accused of being a bad guy. And the argument that they make would undo the impari delicto defense. So with respect to those nine causes of action, it doesn't matter. Oh... Do you see my point, Your Honor? Okay. With respect to the other two, the fraudulent transfer causes of action, whether Wachovia is pure or not, if debtor property isn't transferred, debtor property isn't transferred. The fraudulent transfer provisions in the Bankruptcy Code deal with types of transactions as opposed... who's transferring, who's getting, not whether those people are good or bad. It's the kind of transaction involved. And someone can be very, very good and be required to return money under a clawback because of a fraudulent transfer. What about the transfers that were part of the cost of doing business for Wachovia? The commissions and expenses that they took from those accounts, why aren't those transfers? They are. Okay, so why aren't they entitled to recover those? Section 546E of the Bankruptcy Code, Your Honor. Congress has made a determination that payments made in connection with a securities transaction, all payments made to a stockbroker in connection with a securities transaction, any part of it, are not recoverable. Is there any specific mention of commissions in this? There is not, and I would submit that because nobody would ever make the argument that commissions would not fall within this overall rubric. It is... Settlement payment? Settlement payment, Your Honor. We would submit it is most certainly a settlement payment. And, Ron, did you have a question, or shall I... I was just asking. You were saying it falls under. I wanted to know where you were saying it fell under. Absolutely, and there are two aspects to it. And why is it that commissions are entitled to some kind of heightened priority under the statute? They're not entitled to heightened priority. They're entitled to what Congress said. What Congress said is any payment to a stockbroker in connection with a securities transaction, and there are two parts of it, including the catch-all language. Congress made a determination. They did a weighing, and they said, the security system is important to protect, and we don't want to do anything. We don't want to unwind transactions in connection... Of course, that will have a bad effect on the securities markets. That's the rationale for it. So they said when there's payment to or from a stockbroker in connection with a securities transaction, it also applies to commodities and other things. But in connection with that, you can't undo that. 546E prevents that, with an exception. Let me make sure I understand, because getting back, putting these questions together, Judge King and Judge Diaz, aren't there courts that have said where if they are involved in a Ponzi-type scheme, then maybe that 546E, they want to apply that to fees and commissions? I'm not aware of that, Your Honor. Because of their involvement in the process. I'm not aware of that under 546E at all, Your Honor. I apologize. Because I... Because you're talking about the broker-type. All I'm talking about here, and if you think of it as a cascade, where the first question is whose property is transferred, okay? That takes the lion's share of this off the table. Because the lion's share of this are the transfers by the customers. So you have no transfer of customer property. So you put that to the side. But we get there under this 546E, because as you say, as long as we interpret that fees and commission fits in this rubric of settlement payment. But if we say that's not, then you're not under 546E. If we don't... You're right. You're exactly right, Your Honor. If the issue, the only argument we have with respect to commissions is 546E. Because that was a payment made by the debtor to Wachovia for the services Wachovia rendered in securities transactions. The reason that's not recoverable is because 546E says a payment to a stockbroker in connection with a securities transaction. And again, Kaiser Steel deals with this, and it talks about settling up accounts with a stockbroker. Let me return to part of Judge Diaz's question on the initial transfer. As I understand the other side's argument, there's an argument that Wachovia was an initial transfer when we look at it in light of the Manhattan investment case, because this was an at-issue type account. Therefore, they had dominion and control over it, and so they had an initial transfer. I disagree with that, Your Honor, on so many different levels. First of all, Manhattan investment is wrong in our view, but you don't even have to go near that. The Bowers case from this court is what sets the standard, and the Bowers case says you have to have dominion and control, and you have to actually exercise dominion and control. Even if you accept what Mr. Byrd said is accurate, that the margin agreement, the standard margin agreement, would give dominion and control, it doesn't. And I'll come to that in a moment. But even if you accept that, there is no exercise of dominion and control here. So under Bowers, it completely does not apply. But I'd like to turn for one minute, if I... very briefly, to... You've got some time. Thank you, Your Honor. I'd like to turn very briefly to whether the standard brokerage agreement gives dominion and control, the first leg of Bowers. And by the way, Bowers was also a case that this court noted was a case of first impression. So if you rule the way we are asking you to do on commissions and clarifying that, it will also be a case of first impression, but this court has dealt with that in related contexts. So what the appellant is arguing here is that a standard brokerage agreement makes every brokerage firm in this country an initial transferring. It makes every single brokerage firm an initial transferring. It's not the law. It couldn't possibly be the law. And there's no authority for that. If you look at the facts in Manhattan investment, Manhattan investment was a decision by a bankruptcy judge in New York City, and the facts there involved Bear Stearns. And there, there was a separate account, not the trading account that was used by the Manhattan Investment Fund, one of these hedge funds, but there was a separate account set up at Bear Stearns' direction into which the debtor, before it was the debtor, into which the debtor was required to put money. And that's not what you have here. Not even remotely what we have here. It was something that was set up for the purpose of those funds staying with Bear Stearns for security. It was not put into that account for the purpose of affecting transactions, which is what we have here. That's the financial intermediary aspect. Now, I believe, and I know we say it in our brief, that Manhattan investment is wrong. It overread those facts. But those facts are not even remotely what we have here. So when Grayson Consulting argues to you that this decision of a bankruptcy court in New York City sets the standard, no, it doesn't. It doesn't say what they say it says, and there are loads of other authorities that we talk about that actually describe the standard. The Second Circuit, there was an appeal in the Gred or the Manhattan investment case. The Second Circuit did not deal with this issue. It expressly said it was not dealing with this issue. Bear Stearns won on other grounds in that case. So to the extent that Manhattan investment is waved around as this controlling authority, it's really not. And then Grayson Consulting builds on that by citing the Bayou case. The Bayou case wasn't bankruptcy court. That was an unexplained arbitration award. So number one, it has no presidential value. And number two, we don't really know all of the facts. And the decisions, the court decisions in that case by district court in New York and by the Second Circuit were not on the merits of that arbitration award, but were on the manifest disregard standard because it was a challenge to an unexplained arbitration decision. And the court's very clear that it's not on the merits of that. So when the only authority that's being talked about by Grayson Consulting on this really don't support what they're saying and certainly don't apply to the facts we have here. I know I'm going... I think I'm going long. Let me just ask another question about this commission issue, and that is, should there be a distinction between the bottom-line cost of a transaction, of a settlement transaction, and the profit of the broker? That seems to be the argument that the other side is making, that we should make a distinction, that the latter is discretionary, not necessary to the operation of the transaction. What do you say to that? Not surprisingly, I disagree. The Congress made no such distinction. Congress had a very clear objective, and, in fact, it amended 546E in 2006 to make very clear that it's extremely broad. And is it possible, in a particular case, to look at a transaction and say, you know what, we could do this with this amount that was paid and that with that amount that was paid, and it wouldn't harm the system? The answer is, of course, of course you can do that. But Congress said, no, you can't do that. And the reason you can't do that is they don't want that sort of tinkering. They want it absolutely clear. They want the system intact. And, Judge Diaz, you asked a question, you're focusing, you know, on... which is the core issue, on the commissions and the fact that that... those get paid to the brokerage firm. That isn't, that isn't the buy or sell of the securities. Margin interest is the same. Margin interest also gets paid. And margin interest, we think, is unquestionably within the stockbroker exception. And this is analytically no different at all. And we think this is one of those instances where Congress sort of used a little bit of a belt and suspenders to make it clear. When we say we want it broad, they have the first sentence of 546A, and then they have the catch-all language. And then they have the amendment, which says, and we mean it. It's to, in effect, it's to clarify that it's, if there's any doubt, that it was meant to make clear that it's an extremely broad exemption. And that's the, that's the weighing that they did. Of course, of course, you're interested in every penny of what's going here, but these commission and fees are relatively low in terms of what, I understand the other side says, that issue here, $161 million. Yeah, they are relatively low, but they're very important, Your Honor. The principle is, is, is very, very important here. And we think that the authorities that we, that we have laid out make it clear that Judge Waits and Judge Berlesman had it exactly right on this. Judge Waits' opinion very clearly, very carefully separated out the threads of the different claims and the reasons why each of those claims fail. And we think the authorities are absolutely clear. You know, on that point, we think when you put, you know, the starting point here of the Bowers case on dominion and control really answers it. Mr. Byrd referred to the Lowry case, which is an earlier case, earlier than Bowers, in this court. It was a very different situation there. There, the recipient, the person who there was an issue about initial transferee, got the money and chose what to do with that money. So the bank, which was a step further away, was held not to be an initial transferee. That's because the first recipient could have done whatever he wanted with it. He had an obligation to the bank, and he chose to discharge the obligation. Very different situation. Here you have a brokerage firm providing routine brokerage services. It's a financial intermediary, the way there are hundreds or thousands of such financial intermediaries. And to hold that Wachovia is an initial transferee here is not supported by the facts, and most respectfully, it's not supported by the law. Thank you, Mr. Ratner. Thank you very much. Mr. Byrd? Yes, sir. Thank you. Pleased to hear from you, sir. All right. Gentlemen, whether you knew it or not, I think you hit on some of the great points, which I think undercut their very arguments. And Judge Diaz, you pointed out what I think is a fallacious inconsistency in their argument, and that is if the victims of the Ponzi scheme had given the shares to Derivium in their own account, and then Derivium had transferred them into the Wachovia account, they're suggesting that would be a different outcome. Well, that's... No, I don't think so. I think he's suggesting that it remains Derivium's account in Wachovia, therefore there's no transfer. And that gets to my point, which is once the real event is when the shares hit the Derivium account, a couple of things happen. One, rights are afforded by the margin agreement. Now, I understand Mr. Ratner to be saying, look, GRED is bad law, and Bayou, which follows GRED, is bad law, which is kind of surprising since usually you see cases out of New York where they say they're the financial epicenter of the world. All deference should be given to decisions coming out of those courts. Well, in this case, they did have it right. First of all, in Bear Stearns, they talk about the margin agreement, which, by the way, if you go back and compare the terms, is extremely comparable to the margin agreement in this case. But take it a step further. In the Bayou case, which Mr. Ratner dismisses as sort of surplusage in an affirmance of arbitration, the court says this. The court says this is Judge Buchwald, who's highly regarded. But the most recent case on point in this district, Bear Stearns, cuts in favor of the creditors' committee. And the point being is that once the shares hit the account, something is happening. A transfer is happening. But take it a step further, gentlemen. This 546E, that plays an important cog in this respect. Wachovia throws around language of insulation. And you heard it again today. Mere conduit. Intermediaries. Mere repository. As if it's just the phone line just carrying on business between schemers and victims and the market. Well, that's not at all what happens here. 546E says it. 546E says that notwithstanding this whole conduit nature, as they call it, within one year of the event under 548A1A, there is no brokerage exception. Anything that happened within that year can be brought back under a fraudulent transfer scheme. And it's not just the commissions, gentlemen. It would be margin interest commissions. It would be the settlement payments for the stock purchases. It would be the settlement of delivering stock for the sale of the stock itself. So 546E stands for the proposition, which undercuts their whole argument. They're not just a conduit. If they were just a conduit, there would be no liability at all under 546E. You would have no reason at all to try to pull back anything from the brokerage firm if they're just a conduit. They're just the phone line. Isn't 546E a defense to avoidance? No, it is a narrowing of the avoidance. In other words, what it says is that all avoidances are going to be left out except 548A1A, which is one year transfers with the intent to defraud or frustrate creditors. 546E, they call it the stockbroker exception, but it does have teeth, gentlemen. And you could take 546E and say any settlement payment, which I would interpret to mean a cash to pay for a purchase or delivery of shares to pay for a sale, could be dragged back in under 546E, which is applied 548A1A. So the language of insulation they throw around is not the reality. What did the bankruptcy court do with that one-year avoidance period? I understood that the court declined to rule on that. Well, what it did is it said there was no transfer at all and just sort of it never got past the threshold issue. It said there's no transfer when the shares hit the account. It disregarded the transfer of the shares and it just sort of ignored the whole settlement process, which is... That's based on a determination that it said Wachovia was not an initial transfer. Well, what they said, well, they also said there's no transfer of the property of the debtor. It sort of glossed, the judge glossed over this whole concept of the settlement process and Mr. Ratner refers to the Kaiser case. Look at the Enron case. The Enron case is very instructive on what happens. The brokerage firm in the settlement process has real skin in the game. For example, if the brokerage firm effects a sale of the shares but doesn't get the shares from the customer to settle up, the brokerage firm's on the hook. It's not just... They're not just, oh, well, if the check doesn't clear, it's not my fault. They are absolutely on the hook. Conversely, if the brokerage firm buys shares in the market  the brokerage firm is on the hook and therefore, it is a flawed argument to say they are a mere conduit. They are an integral part in the chain of commerce which means they have to be a transferee which, of course, is where Judge Waits never got past that threshold. I will conclude, gentlemen... No, because he said 546E was in defense of the board. Well, certainly... He didn't get to it. You know, when you go back and you read it, he never really... He just sort of ignores the whole settlement process altogether, quite frankly. And then with respect to... He discredits GRED in its entirety. But I'll leave this with one last thought about GRED. It's very interesting. They say GRED is different because in the GRED case there was a separate account set up specifically to backstop the short sale transactions and it wasn't part of the daily activity. I would submit that when the account is right there, not as a backstop account, it's the account that's right there. And while COBE doesn't have to wait in the event it needs the account, it daily is pulling the cash or the stocks out of that account to affect the transfer. That actually is worse than the GRED case because it took what it needed to, when it needed to, in order to affect the transaction. And I'll leave this with one last thought, gentlemen, and I'll conclude. This is not an assault on the brokerage industry. Honest, diligent brokers need not beware. It's only when the brokerage firm becomes an integral cog in the facilitation of a Ponzi scheme, as in this case, that caution is necessary. And this is one of the tools that, unfortunately, if the court's opinion is left unchecked, will be taken out of the arsenal of the trustees and the accreditors. Thank you. Thank you very much, Mr. Byrd. We'll come down and re-counsel and just take a short break.
judges: Robert B. King, James A. Wynn, Jr., Albert Diaz